# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00674-COA

JAMES S. WELLS, JR.                                                    APPELLANT

v.

KATHRYN M. WELLS                                                        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/24/2023 |
| TRIAL JUDGE: | HON. ROBERT Q. WHITWELL |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | EDWARD DUDLEY LANCASTER CARNELIA PETTIS-FONDREN |
| ATTORNEYS FOR APPELLEE: | PRISCILLA M. GRANTHAM ADAMS CHRISTI R. McCOY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 09/10/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. James Wells Jr. appeals from the Lafayette County Chancery Court's judgment granting a divorce to his wife Kathryn Wells and a judgment divesting him of his interest in 92.5 acres of property. James argues (1) that the chancery court lacked personal jurisdiction over him because Kathryn failed to prove service of the summons and complaint upon him and (2) that this failure resulted in his inability to present evidence, which led to the chancery court inequitably dividing the parties' marital assets and improperly divesting him of property. Finding the evidence does not support the chancery court's finding that James was properly served, we reverse the chancery court's judgments and remand for further

proceedings.

**FACTS**

¶2.     On October 7, 2022, Kathryn sued James for divorce in the Lafayette County Chancery Court alleging grounds of habitual cruel and inhuman treatment, including spousal domestic abuse, and habitual and excessive drug use.  In her divorce complaint, Kathryn generally requested that the chancery court grant her a divorce and equitably divide the marital assets of the parties.  She did not identify what the marital property included.

¶3.     On October 14, 2022, the clerk issued a summons to James pursuant to Rule 4 of the Mississippi Rules of Civil Procedure.[1]  Specifically, the summons contained James's address in Oxford, Mississippi, and stated:

NOTICE OF DEFENDANT

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTON TO PROTECT YOUR RIGHTS**.

You are required to mail or hand deliver a copy of a written response to the Complaint to Priscilla Grantham, the attorney for Plaintiff, whose address is P.O. Box 928, Oxford, Mississippi 38655.  Your response must be

---

[1] Rule 4 states in part:

(a) Summons: Issuance. Upon filing of the complaint, the clerk shall forthwith issue a summons. . . .

(b) Same: Form. The summons shall be dated and signed by the clerk, be under the seal of the court, contain the name of the court and the names of the parties, be directed to the defendant, state the name and address of the plaintiff's attorney, if any, otherwise the plaintiff's address, and the time within which these rules require the defendant to appear and defend, and shall notify him that in case of his failure to do so judgment by default will be rendered against him for the relief demanded in the complaint.

2

mailed or delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a Judgment by default may be entered against you for the money or other things demanded in the Complaint. You must file the original of your response with the Clerk of this Court within a reasonable time afterward.

¶4.     On October 29, 2022, Deputy Billy Rodela of the Lafayette County Sheriff's Department allegedly served James. (Although Deputy Rodela completed an unsworn return and dated it October 29, 2022, the return was not filed in the chancery court until months later on March 16, 2023, after the divorce hearing was held.) James did not file a response to the divorce complaint within thirty days of service, and on January 10, 2023, Kathryn obtained an order setting the matter for trial. This order was not sent to James.

*Hearing on Divorce Complaint*

¶5.     On February 21, 2023, the chancery court conducted a hearing on Kathryn's divorce complaint. The transcript shows that at the beginning of the hearing, the chancery court asked if James Wells was present; Kathryn's attorney replied that he was not. The court then proceeded to hear testimony from Kathryn. The transcript does not reflect whether the chancery court checked the court file to insure that James had been served, nor did the chancellor or the bailiff call for James in open court.

¶6.     The only witness to testify was Kathryn, who presented a temporary restraining order issued from justice court to corroborate her claims of domestic violence and habitual cruel and inhuman treatment. Kathryn testified that she and James married in 1997 and separated on January 18, 2022. They had one child together, Trey, who at the time of the proceedings was twenty-five years old and still lived with Kathryn. Kathryn testified that she was a nurse

3

and that although James provided handyman services, he was not regularly employed. He received no disability, retirement, or social security benefits.

¶7.    Kathryn said that she had called the police to her home several times over the past year because her husband attempted to "physically menace" her and placed her in fear of imminent serious bodily injury. She said James had shotguns in the home and in his vehicle, and he had communicated verbally and in writing to her that he was going to shoot and kill her. James stalked her by staying at his sister's house across the street from Kathryn's home, where he watched her with binoculars and a spotlight. She said this type of behavior had begun in May 2021. Because of these threats, Kathryn said she did nothing alone and relied on her son to take her to and from work and to the grocery store.

¶8.    Kathryn said that when James assaulted her in May 2022, she obtained a temporary restraining order (TRO) against him, which Kathryn said James had violated three times. On one occasion, when he blocked the driveway and refused to let her leave for work, Kathryn had to call the police to make him leave. At that point Kathryn took all James's guns and put them in her daughter and son-in-law's house in Senatobia for safekeeping.[2]   After this incident, Kathryn said James's sister-in-law called the police to anonymously report that James had purchased a gun without a serial number and that he was threatening to kill Kathryn and Trey. The next day, James was arrested for disturbing the peace. Based on these incidents, Kathryn's TRO was extended for ninety days but was never made

---

[2] Kathryn testified that she and James had only one child together; the daughter she referred to could be from another marriage or relationship.

permanent.[3]

¶9.    The court asked Kathryn what relief she wanted.  Her attorney responded for her, saying that she wanted "the marital property, including the real property," and "to be free of her husband and this marriage."  The court asked if the house was the only asset they had and Kathryn's attorney responded that all personal property had already been divided, and there was no cash in the joint bank accounts.  Kathryn currently drove a 2003 Hyundai Sonata that Trey had purchased at an auction.  James drove a 2008 Silverado truck that was titled in both parties' names and was paid off.[4]  Kathryn also had a tractor, purchased in both names, that she said she had been paying on for seven years, and it was almost paid off.

¶10.    Kathryn said that James was living in a "pull-behind" camper on a neighbor's property down the road.  Her attorney told the court that Kathryn and Trey were living in a trailer, which was titled in James' name, located on 92.5 acres of property that was in the names of James and his son, Trey.[5]  Kathryn testified that she and James had sold property in town and began building a home on the 92.5 acres.  The attorney said that the parties had intended for the son to live there after they passed away.  However, in light of the divorce, the attorney said,

---

[3] Kathryn's attorney told the court that they had decided to proceed with the divorce instead of pursuing a permanent restraining order because, in her view, James had already violated the TRO multiple times and it appeared to actually exacerbate his behavior.

[4] This truck was purchased for $18,000 in 2015.

[5] No deed was admitted into evidence so it is unclear exactly how the title of the property was held.  However, the chancellor stated in the record that he understood that the son had a one-half interest and James had a one-half interest in the 92.5 acres and, that the parties "have a house and land that is in the husband's name and the son's name, Trey."

5

> I would like to divest Mr. Wells of the property, and the son, Trey, can execute a deed with a life estate to Ms. Wells, which is what he and Ms. Wells would like to do.

Although the home was not finished, Kathryn said that when it was, James could have the trailer that she and Trey were living in. The chancellor asked if Kathryn knew the value of any of this property—the trailer, "any of it." Kathryn said that she did not, and no valuation was ever produced. At the end of the hearing, the chancellor stated that he intended to divest James of his one-half interest in the house and land, but James could have the trailer if he moved it off the land.

¶11. On February 21, 2023, the chancellor signed an order granting the divorce, finding that James had committed domestic abuse against Kathryn for a continued period during the marriage. The chancellor also stated in his order that the "Plaintiff shall be granted exclusive ownership, use, and possession of the 92.5 acres," and the "Defendant shall be divested of any and all title, right, and interest of said property. This [c]ourt will enter a separate Order divesting Defendant of title[.]" The divorce judgment also allowed James to keep the trailer if he wanted, but he would be required to pay for it to be removed from the property within sixty days, or else Kathryn could dispose of it. The chancellor further ordered that James would maintain possession and ownership of the 2008 Silverado, and Kathryn would maintain possession and ownership of the 2003 Hyundai. Lastly, the chancellor entered an injunction against James, ordering him not to go within 500 yards of Kathryn except for the purpose of moving the trailer. Two days later, on February 23, 2023, the court signed a separate judgment divesting James of title to the 92.5 acres. Both judgments were entered

on February 24, 2023.

*Motion to Set Aside*

¶12.   Following the entry of these judgments on February 24, 2023, on March 13, 2023, James filed a motion to set both aside, arguing that he had not been properly served. He attached to the motion a copy of the docket, which did not reflect any return of service being filed. The docket showed that the divorce complaint had been filed on October 7, 2022, and that the summons had been issued on October 14, 2022. James further argued that he did not receive proper notice of the date that the divorce matter would be heard.

¶13.   On March 13, 2023, James also filed an answer to Kathryn's divorce complaint and a counterclaim for a divorce from Kathryn on the grounds of adultery and habitual cruel and inhuman treatment. He pleaded that "the parties own real property at/in Oxford, Mississippi that he [James] had owned prior to the marriage and [that the] property has not been commingled."

¶14.   On May 8, 2023, Kathryn filed a motion to dismiss James's motion to set aside the February 2023 judgments. She argued that James was personally served with the Rule 4 summons and a copy of the complaint by Deputy Billy Rodela of the Lafayette County Sheriff's Office on October 29, 2022. She attached a more recent copy of the docket, which reflected that the return was filed with the court on March 16, 2023, as well as a copy of this return that Rodela had completed and signed. Kathryn said that "[d]ue to inadvertence[,] the return was not filed immediately after the summons was served." Kathryn said that James had been properly served before the divorce hearing, and that Rule 4(f) states that "[f]ailure

7

to make proof of service does not affect the validity of the service." Kathryn further argued that because James was properly served but failed to timely answer, he was not entitled to notice of subsequent hearings.

¶15.    The court heard James's motion to set aside the February 2023 judgments on May 10, 2023.  During this hearing, James called his nephew, Samuel Lee Jones, who testified that James was living with him and his mother at the time the deputy came to serve James.  James was on the porch when the deputy came, and Samuel was inside.  After the deputy left, James came inside with the papers that were given to him and showed them to Samuel.  Samuel testified that the "papers" consisted of only the complaint; there was no summons attached.  Samuel identified the complaint that was served and testified that because he helped his uncle with paperwork, he kept the complaint and brought it to court for the hearing.  The complaint Samuel brought was entered into evidence.  When shown the Rule 4 summons, Samuel was emphatic that it was not attached to the complaint James was served.

¶16.    James also called Linda Wells Jones, who was both his sister and Samuel's mother.  Linda testified that she was also present on the day that James was served with the complaint.  Linda said she and James were on the porch when the deputy came the first time and served James with paperwork.  Linda confirmed that the summons was not attached to the complaint that James received.  She said they were not aware when James needed to be in court, or they would have been there.  She confirmed that her son helped James out and kept James's paperwork.  On cross-examination, Linda testified that when he got the papers from the deputy, James commented that he had lost everything.  After further questioning, Linda

indicated that James may have made this comment when a deputy came another time and perhaps brought James a copy of the final judgment of divorce.

¶17. Linda also testified that the 92.5 acres was inherited land, "so that was my land, too—well not on paper, but I'm part of the family. It was my daddy that bought it and left it to Jimmy." She later clarified that the land was deeded to her brother (James) and James's son. Thus, she had no personal interest in the property. Regardless, no deed was presented.

¶18. After Linda, James testified that the deputy only served him with "one thing, and that's the papers—the October papers." He said he found out that the divorce had been granted when he went to the house and his wife "came outside yelling and screaming and told me to get out of here[;] that it's her house. The judge gave her her house—my houses and gave Trey all of my land." Upon hearing this, James went to his sister's house and called the chancery court. He learned that the divorce hearing was held on February 21, 2023, and the clerk told him that "in fourteen or fifteen days, it would have been legal." James said he then contacted an attorney "to stop it before it became final."

¶19. James confirmed that in October 2022, a deputy came to his sister's house and gave him only the divorce complaint. His sister was with him on the porch. They both then went inside where Samuel was cooking, and he showed the "papers" to him. James said that they discussed the complaint, but he was not worried about it at the time because "it didn't have any dates on it to go forward and nothing like that . . . it just said what she wants." When shown the Rule 4 summons, James denied receiving it.[6] Because the divorce complaint

---

[6] During direct and cross-examination, James indicated that he could not read the paperwork because of his poor eyesight. When provided with reading glasses, and after

contained no dates telling him when or where to appear, James explained, "we weren't worried about it" at that time. James admitted that deputies had been out to talk to him about other matters but only once about the divorce. He also said that he had not spoken to his wife in two years.

¶20. James also testified that his wife was selling off items, such as the four-wheeler, and that $50,000 to $80,000 worth of antique furniture was gone from the house. James also said that he put over $400,000 into the construction of the new home. He said the divorce complaint asked for an equitable division of the property, but he got nothing. In addition, he said he never received a copy of the divorce judgment.

¶21. Kathryn called no witnesses to testify.

¶22. James's attorney argued to the court that James never received a summons and that when James retained her as his attorney, she checked and found no proof in the case file of any service. There was also no proof that James had been sent a copy of the divorce judgment so that she could proceed with the appropriate motions within the ten-day time period. James's attorney noted that in the divorce complaint, Kathryn asked for an equitable division of the marital assets, but she later asked to be awarded the entirety of the marital assets, which she pretty much received.

¶23. During her argument, Kathryn's attorney said that the sheriff's office usually files the return, but in this case, the "return had been returned back to us, and we were unaware that there was a cross-up." The attorney told the court that the return had in fact been sitting in

_____

having read aloud the language in the Rule 4 summons, James distinctly denied ever being given that document.

10

their file. Kathryn's counsel pointed out the inconsistencies among the testimonies of Samuel, Linda, and James, and argued that their testimonies were all self-serving so that they could "get back his Pa-Pa's land." Concerning the equitable division of property, Kathryn's attorney argued that because Kathryn worked and James was unemployed, the court could find it equitable to give everything to Kathryn.

¶24. At the close of arguments, the court ruled on the record that James had not presented enough proof to rebut the deputy's signed return of service. Concerning the division of the property, he said that James was given the 2008 Silverado and the trailer. Accordingly, on the record, the court denied James's motion to set aside the February 2023 judgments and entered a written order on May 12, 2023.[7]

¶25. James filed a notice of appeal on June 8, 2023. On appeal, James argues that (1) he was not properly served under Rule 4 of the Mississippi Rules of Civil Procedure, and (2) due to this failure to be properly served, he was unable to present contradicting evidence, and the chancery court failed to equitably divide the parties' marital property.

**STANDARD OF REVIEW**

¶26. We will not disturb a chancellor's findings of fact "unless the chancellor's decision is manifestly wrong or unsupported by substantial evidence." *Pritchard v. Pritchard*, 282 So. 3d 809, 812 (¶11) (Miss. Ct. App. 2019). But "[w]hen reviewing questions concerning jurisdiction, this Court employs a de novo review." *Id*. (citing *Sanghi v. Sanghi*, 759 So. 2d

---

[7] After the hearing on James's motion, the court heard a matter in a different domestic abuse case Kathryn had pursued against James. Those proceedings are irrelevant to the appeal in this case.

11

1250, 1252 (¶7) (Miss. Ct. App. 2000), *overruled on other grounds by Bolivar v. Bolivar*, 378 So. 3d 433, 439 (¶¶23-24) (Miss. Ct. App. 2024)). Sufficiency of process is a jurisdictional issue. *Clark v. Clark*, 43 So. 3d 496, 499 (¶9) (Miss. Ct. App. 2010). Per well-established precedent involving domestic disputes, the chancellor's conclusions of law receive de novo review. *Chesney v. Chesney*, 910 So.2d 1057, 1060 (¶5) (Miss. 2005) (citing *Southerland v. Southerland*, 875 So. 2d 204, 206 (¶5) (Miss. 2004)). Again, however, "[a] chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous." *Sanderson v. Sanderson*, 824 So. 2d 623, 625 (¶8) (Miss. 2002) (quoting *Consol. Pipe & Supply Co. v. Colter*, 735 So. 2d 958, 961 (¶13) (Miss. 1999)). "With regard to service of process, this court applies an abuse-of-discretion standard of review to the trial court's findings of fact." *Long v. Vitkauskas*, 228 So. 3d 302, 304 (¶5) (Miss. 2017).

## DISCUSSION

¶27. In his motion to set aside the February 2023 judgment of divorce and judgment divesting him of his interest in 92.5 acres of property, James claimed that he was served only the complaint and not the summons. James contended that without sufficient service of process, the court lacked personal jurisdiction, making the judgments void. The chancery court denied his motion, and on appeal, James argues that the chancery court abused its discretion and that he presented sufficient evidence to rebut the presumption of service raised by the return of the process server.

¶28. "Service of process is the physical means by which personal jurisdiction is asserted." *Webster v. Fannings*, 311 So. 3d 1157, 1160 (¶7) (Miss. 2021). "In the absence of proper

12

service of process, the court lacks jurisdiction." *Villavaso v. S.H. Anthony Inc.*, 309 So. 3d 587, 593 (¶19) (Miss. Ct. App. 2020). "It is well settled that in divorce cases, Rule 4 of the Mississippi Rules of Civil Procedure provides for the means of service of the original complaint and the form of the accompanying summons." *Clark*, 43 So. 3d 499 (¶11). Rule 4 includes the forms and procedure by which a plaintiff may serve a defendant in an action.

¶29. This requirement is found in Rule 4(b), which states:

> The summons shall be dated and signed by the clerk, be under the seal of the court, contain the name of the court and the names of the parties, be directed to the defendant, state the name and address of the plaintiff's attorney, if any, otherwise the plaintiff's address, and the time within which these rules require the defendant to appear and defend, and shall notify him that in case of his failure to do so judgment by default will be rendered against him for the relief demanded in the complaint. . . . Summons served by process server shall substantially conform to Form 1A. Summons served by sheriff shall substantially conform to Form 1AA.

M.R.C.P. 4(b). The Form 1AA (for a sheriff) referred to in Rule 4 states the following in part:

> THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.
>
> You are required to mail or hand-deliver a copy of a written response to the Complaint to _____, the attorney for the Plaintiff(s), whose post office address is _____, and whose street address is _____. Your response must be mailed or delivered within (30) days from the date of delivery of this summons and complaint or a judgment by default will be entered against you for the money or other things demanded in the complaint.
>
> You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

¶30. Rule 4(a)(2) requires that the person served be given both a copy of the summons and

13

a copy of the complaint, stating, "The person to whom the summons is delivered shall be responsible for prompt service of the summons and a copy of the complaint." M.R.C.P. 4(a)(2). Service of both the summons and the complaint is needed for jurisdiction to attach unless the defendant voluntarily appears. *Richard v. Garma-Fernandez*, 121 So. 3d 929, 933 (¶21) (Miss. Ct. App. 2013). Mississippi Rule of Civil Procedure 4(a)(2) is similar to Rule 4(c)(1) of the Federal Rules of Civil Procedure, which also requires that a person be served with both a copy of the summons and a copy of the complaint.[8] Federal courts have faced the issue of service of one without the other, and as one court plainly stated, "[s]ervice of a complaint without a summons is improper." *Cherry v. Spence*, 249 F.R.D. 226, 228 (E.D.N.C. 2008) (also stating "[e]ach defendant is entitled to a summons or a copy thereof").

¶31. Under Mississippi law, personal service of process may be made by the sheriff. M.R.C.P. 4(c)(2). If service is made by the sheriff, he or his deputies must comply with Rule 4(c)(2) concerning the filing of the proof of service. This rule states:

> (2) By Sheriff. A summons and complaint shall, at the written request of a party seeking service or such party's attorney, be served by the sheriff of the county in which the defendant resides or is found, in any manner prescribed by subdivision (d) of this rule. The sheriff shall mark on all summons the date of the receipt by him, and within thirty days of the date of such receipt of the summons the sheriff shall return the same to the clerk of the court from which it was issued.

M.R.C.P. 4(c)(2). Rule 4(c)(1) also allows for service to be made by a process server who is not a party and not under the age of eighteen. M.R.C.P. 4(c)(1). Rule 4(f) provides that

---

[8] In the next subsection on discussing service of process, Federal Rule of Civil Procedure 4(c)(2) states, "Any person who is at least 18 years old and not a party may serve a summons and complaint."

"if service is made by a person other than a sheriff, such person shall make affidavit thereof." M.R.C.P. 4(f). The rule further states, "Failure to make proof of service does not affect the validity of the service." *Id.* "However, the absence of some proof of the receipt of a summons makes the notice questionable." *Smith v. First Bank*, 195 So. 3d 790, 793 (¶10) (Miss. Ct. App. 2015).

¶32. The rules on service of process are to be strictly construed. *Wharton v. State ex rel. Pearl Police Dep't*, 349 So. 3d 197, 205 (¶23) (Miss. Ct. App. 2022); *Townsend v. What a Combo Inc.*, 281 So. 3d 43, 46 (¶8) (Miss. Ct. App. 2019); *Birindelli v. Egelston*, 404 So. 2d 322, 323-24 (Miss. 1981). If our Rules of Civil Procedure have not been complied with in this context, the court is without jurisdiction unless the defendant appears of his own volition. *Kolikas v. Kolikas*, 821 So. 2d 874, 878 (¶16) (Miss. Ct. App. 2002) (citing *Amer. Cable Corp. v. Trilogy Commnc's Inc.*, 754 So. 2d 545, 549 (¶7) (Miss. Ct. App. 2000)). In *Kolikas*, the husband filed for divorce against his non-resident wife and published the summons in the newspaper, but neither he nor the clerk ever mailed the summons to the wife. *Id.* at 876 (¶3). This Court affirmed the trial court's ruling that the wife had not been properly served under our Rules. *Id.* at 878 (¶18).

¶33. If a process server has properly executed a return, there is a presumption that service of process has occurred; however, "this presumption that service has been effected is rebuttable through the use of extrinsic evidence, including the testimony of the party who is contesting service." *Collins v. Westbrook*, 184 So. 3d 922, 929 (¶18) (Miss. 2016) (citing *McCain v. Dauzat*, 791 So. 2d 839, 842 (Miss. 2001)). In *Collins*, the process server swore

15

in his return of service of process and testified in court that he served process on an individual in a pizzeria, who said he was Dr. Toikus Westbrook. *Collins*, 184 So. 3d at 927-28 (¶¶11-12). However, Toikus filed an affidavit saying that lived in New Orleans and was never served. *Id*. at 928 (¶14). His father signed an affidavit saying that the process server served him. *Id*. Based simply on the affidavits of two individuals, the trial court found that Toikus had rebutted the presumption *and countered the testimony* of the process server. *Id*. at 928-29 (¶¶15, 18). We affirmed the trial court's ruling. *Id*. at 929 (¶18).

¶34. In addition,

> actual notice does not cure defective process. Even if a defendant is aware of a suit, the failure to comply with rules for the service of process, coupled with the failure of the defendant voluntarily to appear, prevents a judgment from being entered against him.

*Clark*, 43 So. 3d at 499 (¶12); *Blakeney v. Warren County*, 973 So. 2d 1037, 1040 (¶13) (Miss. Ct. App. 2008). In *Pritchard*, 282 So. 3d at 817 (¶31), we further noted that "a defendant is 'under no obligation to notice what is going on in a cause in court against him, unless the court has gotten jurisdiction of him in some manner recognized by law.'" (Quoting *Kolikas*, 821 So. 2d at 879 (¶32)). When service of process is not achieved, the chancellor lacks personal jurisdiction, and the divorce is void. *Id*. We further held that

> [w]hen a divorce is invalidated, all matters decided as a result of the divorce decree are null and void and should be brought in another hearing. *Peterson v. Peterson*, 797 So. 2d 876, 879 (¶12) (Miss. 2001). Accordingly, the equitable distribution of marital assets is also null and void, and a new hearing must be held.

*Id*. at (¶33).

¶35. In this case, James testified under oath that although the deputy served him with a

16

copy of Kathryn's complaint, no summons was attached. James stated that he was at his sister Linda's home when the deputy gave him the complaint. He went inside where his nephew Samuel was cooking, and James asked him to look at the "papers" because James had difficulty reading such documents. James said that there was no paper telling him when or where to appear, so they "weren't worried about it." In addition to James's testimony, James called his sister Linda to testify as well as Samuel. They confirmed that James was only given a complaint. Samuel kept the complaint James was served, which did not have any summons attached. Samuel brought it to court, and it was entered into evidence. When shown the summons, all three stated they had never seen it.

¶36. Samuel brought the "papers" James had been served to the attorney James eventually hired. There was no summons attached to the complaint, and when the attorney checked the court docket, she found that there was no return of service of process filed with the court. To explain this, Kathryn's attorney told the court that the deputy sent the return to her, instead of filing it with the clerk as the Rules required. Kathryn's attorney said that the return was actually in her file.[9] We find that the testimony of three witnesses and the documentary evidence of a complaint without a summons presented by James was sufficient to rebut the presumption of proper service.

¶37. The dissent disagrees and implies that in this case the chancery court ruled against

---

[9] We note that the transcript of the divorce hearing does not indicate that the court checked the court file for service of process and that Kathryn's attorney did not present the return to the court if it indeed was in her file at the time. Yet the court proceeded to hear the matter and rule without confirming that James had, in fact, been personally served and that the court had personal jurisdiction.

James because it found his testimony and his witnesses' testimony lacked credibility. However, the chancery court made no such finding in this case. The dissent would require us to *assume* the chancellor found all three witnesses to be unbelievable simply because the chancellor ruled against James, citing *Rankin v. Rankin*, 323 So. 3d 1073 (Miss. 2021). In *Rankin*, the chancery court heard extensive testimony from both the wife, Kemily, and the husband, Kelvin, in a divorce case and held that Kemily had failed to produce sufficient evidence of habitual cruel and inhuman treatment. *Id*. at 1080 (¶17). Even though the chancellor gave no indication that she disbelieved Kemily or failed to find her credible, *id*. at 1079 (¶14), the chancellor still had Kelvin's testimony to weigh against Kemily's testimony to determine whether she had presented sufficient proof. *Id*. at (¶17). Here, Kathryn presented no testimony or evidence in opposition to the testimony and evidence James had presented at the hearing. There was no opposing witness for the chancellor to observe and evaluate and determine who was more credible.

¶38. Nor are the facts of this case similar to those cases cited by Kathryn where the courts did determine the credibility of a witness. In *Villavaso*, 309 So. 3d 587 at 591 (¶¶7-8), the trial court had before it contradictory and competing affidavits and testimony. Villavaso's testimony and the affidavit of his girlfriend contradicted each other concerning the dates that the process server attempted service. *Id*. at 594 (¶22). In addition, in response to Villavaso's affidavits, Anthony presented an affidavit from the process server about his attempts to serve. *Id*. The court there also had before it subsequent motions Villavosa filed in which he admitted being served with process, totally contradicting his prior denial of service. *Id*. at

18

591 (¶10).

¶39. Unlike *Villavosa*, in this case, James, Linda, and Samuel testified consistently as to what happened on the day James was served, and all testified that James was only given the complaint. Kathryn presented nothing to rebut this testimony.[10] The court did not find that James or his witnesses were not credible, as the trial court did in *McCain*, which stated on the record that the court "did not believe a word" of the testimony offered by the party arguing he was not properly served. *McCain*, 791 So. 2d at 842 (¶8). In this case, the chancellor said several times that he relied on the return, and his only comment on the testimony was to point out that Samuel was a relative who gives James advice. But the chancellor did not find Samuel's testimony was suspect or not credible because of that, as the dissent implies. The Mississippi Rules of Evidence provide that every person, with few exceptions, is competent to be a witness, MRE 601, if he or she has personal knowledge of a matter, MRE 602, and testifies under oath, MRE 603. A witness's blood relationship to a party does not disqualify him from testifying about facts that the witness knows, and we disagree with any troubling assumption that family members lie under oath.

¶40. Moreover, the sufficiency of evidence to rebut a presumption of service of process does not rely on the credibility of witnesses alone. Here, in addition to witness testimony, James produced the original "papers" he was given, which did not have a summons attached. His attorney's check of the docket indirectly confirms that the "papers" James received and

---

[10] Even though the chancellor said that "the papers are there, and the deputy *said* he served him," there was no affidavit or testimony by the deputy presented—only his signature on the process return.

gave her did not contain a summons. The attorney found no return of service on the docket, prompting the filing of the motion to set aside the February 2023 judgments. Oddly, the deputy sheriff's return was sent to Kathryn's attorney, who then filed it a month *after* the judgments in question were rendered. These circumstances, coupled with the proof presented by James and the lack of evidence rebutting that proof, lead us to conclude that the chancery court manifestly erred in finding that James had not rebutted the presumption of service.[11]

¶41. We also disagree with the dissent's position that Kathryn had no obligation to present any evidence because the sheriff's return created a presumption of service that James was required to rebut. When James presented the testimony of three witnesses to challenge the service of process, the burden shifted to Kathryn to respond to James's proof. The Mississippi Supreme Court noted this burden-shifting in *Long v. Vitkauskas*, 228 So. 3d 302 (Miss. 2017). In that case, the parties disputed whether the person served was the agent of the party sued. *Id*. at 305 (¶9). The Supreme Court stated that if the party had presented proof that the person who received process was not that party's agent, "the burden then would have shifted to Long to prove 'Mary' was an authorized agent." *Id*. Although the type of service (non-resident service by certified mail) in *Long* differs from the type of service here (personal service by deputy sheriff), the principle remains the same: when the defendant presents evidence to rebut the presumption of service, the burden shifts back to its proponent.

---

[11] Even the Supreme Court in *Rankin* still required trial courts to examine all the evidence. *Rankin*, 323 So. 3d at 1079 (¶18). *Rankin*'s discussion on witness credibility should not be taken to mean that because the court ruled in favor of one party, it must have found all the evidence presented by the other party incredible. This would preclude a challenge to any court ruling.

Moreover, the return of service alone from which the presumption arose does not rebut the presumption; other evidence is required. *See Priede v. Jones*, 282 So. 3d 1266, 1271 (¶¶14-15) (Miss. Ct. App. 2019) (affirming finding of failure to serve process when plaintiff failed to produce any evidence to contradict defendant's affidavit that she did not receive process, that she did not live at the address, and that she was not married to the individual who allegedly received process). Indeed, neither of the cases the dissent cites, *Villavaso* and *McCain v. Douzat*, 791 So. 2d 839 (Miss. 2001), simply relied on the return of service; both obtained and entered affidavits from the process server and did not rely simply on the return itself. *Villavaso*, 309 So. 3d at 591 (¶8); *McCain*, 791 So. 2d at 842 (¶8). Although James could have called the process server as a witness, he presented other proof, and Kathryn had an obligation to present some evidence in response other than the return itself.

¶42. Given the facts and circumstances of this case, we find that the chancery court's holding that James was served with both the summons and the complaint was not substantiated by the evidence in the record. Although Kathryn presented the return of service of process, James presented sufficient evidence to rebut the presumption that he was served with both the summons and the complaint. Because James was not served, the chancery court lacked personal jurisdiction over him. *Clark*, 43 So. 3d at 501-02 (¶22) ("[W]e find the chancellor, just as in *Kolikas*, did not acquire personal jurisdiction over the defendant because service [of process] in a manner recognized by law was never achieved.") (citing *Kolikas*, 821 So. 2d at 879 (¶32)). Consequently, the divorce and property divestment judgments rendered by the court in this case are void. "A judgment is deemed void if the

court rendering it lacked jurisdiction." *Morrison v. Miss. Dep't of Hum. Servs.*, 863 So. 2d 948, 952 (¶13) (Miss. 2004). "Even if the allegations in the divorce complaint are established by the evidence, the chancellor must also have proper jurisdiction over the parties." *Clark*, 43 So. 3d at 501 (¶20). Accordingly, the chancery court's judgment of divorce, including the division of the parties' assets, and the judgment divesting James of title to the 92.5 acres are void. We therefore reverse and remand for further proceedings.

¶43. On remand, we instruct the chancery court to insure that any division of the parties' property be made according to the factors articulated in *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994). In both its ruling during the divorce hearing and its written order, the chancery court in this case failed to even mention any of the relevant *Ferguson* factors as a basis for his division of the property. The Mississippi Supreme Court has held in no uncertain terms that "[t]he failure to consider all applicable *Ferguson* factors is error and mandates reversal." *Lowrey v. Lowrey*, 25 So. 3d 274, 286 (¶29) (Miss. 2009). On remand and rehearing of this matter, the chancery court shall perform the analysis necessary to equitably divide the assets of the parties.

## CONCLUSION

¶44. Because James provided sufficient evidence to rebut the presumption that he was properly served with process, the chancery court erred by not setting aside the judgment of divorce and the judgment divesting James of 92.5 acres of property. We find that the court had no personal jurisdiction and that the two judgments are void. Accordingly, we reverse the chancery court's judgment of divorce and judgment divesting James of interest in the

92.5 acres. Moreover, on remand, should the chancery court grant the divorce, the court shall include in its findings the bases for its equitable division utilizing the *Ferguson* factors.

¶45. **REVERSED AND REMANDED.**

**CARLTON, P.J., WESTBROOKS AND McCARTY, JJ., CONCUR. EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., LAWRENCE AND SMITH, JJ.**

**WILSON, P.J., DISSENTING:**

¶46. The chancellor did not clearly err or abuse his discretion by finding that James failed to rebut the presumption of service of process. Accordingly, the chancellor's ruling should be affirmed, and I respectfully dissent.

¶47. "When service of process is contested, the trial court must make findings to resolve disputed issues of fact." *Span ex rel. Span v. Nichols*, 306 So. 3d 781, 791 (¶33) (Miss. Ct. App. 2020), *cert. denied*, 308 So. 3d 438 (Miss. 2020). "With regard to service of process, this Court applies an abuse-of-discretion standard of review to the trial court's findings of fact." *Long v. Vitkauskas*, 228 So. 3d 302, 304 (¶5) (Miss. 2017). "The trial court may make such findings based on affidavits with or without live testimony or depositions." *Span*, 306 So. 3d at 791 (¶33); *see* M.R.C.P. 43(c).

¶48. "If a process server has executed a return properly, there is a presumption that service of process has occurred." *Collins v. Westbrook*, 184 So. 3d 922, 929 (¶18) (Miss. 2016). This presumption may be rebutted by extrinsic evidence, including testimony and affidavits. *Id.* "Indeed, testimony by the contesting party, *if believed*, is sufficient to overcome the presumption and to support a finding that she was not served." *Long*, 228 So. 3d at 305 (¶9)

23

(emphasis added) (brackets and quotation marks omitted). "But the trial judge may find that the testimony disputing proper service of process lacks credibility—and, thus, find that the presumption of proper service of process has not been rebutted." *Villavaso v. S.H. Anthony Inc.*, 309 So. 3d 587, 594 (¶21) (Miss. Ct. App. 2020) (citing *McCain v. Dauzat*, 791 So. 2d 839, 842 (¶8) (Miss. 2001)).

¶49. Here, Deputy Sheriff Billy Rodela executed a return stating that he "personally delivered copies of the summons and complaint" to James on October 29, 2022. Thus, a presumption arose that James was properly served. *Collins*, 184 So. 3d at 929 (¶18).

¶50. Indeed, James does not dispute that the deputy served him with the complaint. James only denies that a summons was attached to the complaint. However, James and his two relatives' testimony was self-interested and, in some respects, confusing and inconsistent.

¶51. James's nephew Samuel admitted that he did not see the deputy serve his uncle. James was outside the house when he was served, and he brought the papers inside and showed them to Samuel. Samuel testified that James showed him the complaint and that no summons was attached to it. Samuel testified that he reviewed the paperwork with his uncle, but he "was really just looking for a court date" so that his uncle "could go to court."[12]

¶52. James also called his sister Linda (Samuel's mother) as a witness. Linda felt like the land at issue in the divorce "was [her] land, too," though "not on paper." She wanted "to get that land back . . . to [her] family." Linda testified that she witnessed the deputy serve James with a complaint but no summons. However, on cross-examination, Linda testified that

---

[12] A Rule 4 summons, of course, does not include a court date.

24

when the deputy served him, James said, "I've lost everything. We were supposed to go to court." Linda's statement suggested that she was testifying about James's receipt of the final judgment of divorce, not the complaint. Linda was then asked about the papers James had received in October 2022, and she said, "He got papers, but I don't know what was what because I didn't -- it wasn't any of my business. I didn't get into it." She later testified that the papers James received in October 2022 "mentioned some material possessions that [Kathryn] took," but "[t]here was no court date on it," and "[i]t was just a copy of what he had lost." Near the end of her cross-examination, Linda finally testified that she had witnessed a deputy serve James with papers "[a]bout twice"; one time was when James said he had "lost everything," but she did not know what paperwork James received the other time. On redirect, in response to a series of leading questions, Linda testified that she had witnessed the deputy serve James with the complaint and that she had never seen the final judgment of divorce until her testimony.

¶53.    James testified that the deputy served him with the complaint but not a summons. He also testified that he was "going blind," and he had difficulty reading documents that were shown to him. James said that when the deputy served him with the complaint, he (James) reviewed it with Samuel and Linda, but they "weren't worried about it" and said "it wasn't important" because it did not give him a date to "go to court." James said the complaint was not "legal" or "final" because it did not provide a court date. James said he thought the complaint "was just part of it" and that it should have included "more," although he "didn't know" what exactly he should have received. James also testified that he had never seen the

25

final judgment of divorce until his testimony in court. He said that Linda was "confused" and that he did not say he had "lost everything" after being served by a deputy.

¶54. After listening to the witnesses, the chancellor found that James had not rebutted the presumption of service. The chancellor found that the return signed by Deputy Rodela was more credible than the denials of James and his witnesses.

¶55. Our Supreme Court has made clear that "[i]n a divorce proceeding, the chancellor is the finder of fact, *and the assessment of witness credibility lies within his sole province*." *Carambat v. Carambat*, 72 So. 3d 505, 510 (¶24) (Miss. 2011) (emphasis added). "A chancellor sits as a fact-finder and in resolving factual disputes, is *the sole judge of the credibility of witnesses*." *Murphy v. Murphy*, 631 So. 2d 812, 815 (Miss. 1994) (emphasis added). It is also "for the chancellor to determine the . . . weight of [the] evidence." *Powell v. Ayars*, 792 So. 2d 240, 243 (¶6) (Miss. 2001). We "give[] deference to a chancellor's findings in regard to witness testimony, because"—unlike this Court—"the chancellor is able to observe and personally evaluate the witnesses' testimony and the parties' behavior." *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013) (quotation marks omitted).

¶56. Here, the chancellor was entitled to consider that the testimony of James and his relatives was self-serving and potentially biased. *See, e.g.*, *Stevenson v. State*, 738 So. 2d 1248, 1252 (¶19) (Miss. Ct. App. 1999) (noting that defense witnesses, "on the face of it, were subject to claims of bias by virtue of their family and emotional ties to the defendant"); *Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995) ("[F]amily members can be easily impeached for bias."). Linda was not only James's sister but also claimed that the

26

subject property "was [her] land, too." Samuel was Linda's son.[13] The chancellor was also entitled to consider the various inconsistencies and limitations of their testimony. The chancellor did not clearly err or abuse his discretion by finding that James and his relatives' testimony failed to rebut the presumption of service that arose from the sheriff's return.

¶57. The majority opinion emphasizes that Kathryn did not offer testimony or affidavits at the hearing. *Ante* at ¶¶40-41.[14] But Kathryn was under no obligation to call witnesses or produce additional evidence.[15] The sheriff's return itself was competent evidence of service.

---

[13] By noting these witnesses' self-interest and potential bias, I am not making a "troubling assumption that family members lie under oath." *Ante* at ¶39. These are simply issues that the *fact-finder* may consider in evaluating witnesses' credibility. *Street v. State*, 754 So. 2d 497, 502 (¶17) (Miss. Ct. App. 1999) (holding evidence that a "witness was married to a member of the defendant's gang" was properly admitted to show "bias," and "[i]t then became *the role of the jury* to assess what impact that information might have on the believability of the witness" (emphasis added)). The chancellor, *not this Court*, is the fact-finder in this case. I do not make any assumptions about these witnesses' credibility. Indeed, their credibility is not this Court's concern because *the chancellor* "is the sole judge of the credibility of witnesses." *Murphy*, 631 So. 2d at 815.

[14] The deputy was not required to file an affidavit. Only a private process server is required to file an affidavit as proof of service. A sheriff's return need not be sworn. *See* M.R.C.P. 4(f).

[15] I disagree that "the burden . . . shifted to Kathryn to respond to James's proof." *Ante* at ¶41 (citing *Long*, 228 So. 3d at 305 (¶9)). In *Long*, service was attempted via certified mail, and the certified mail return receipt was signed by an unidentified "Mary" rather than by the defendant. *Long*, 228 So. 3d at 303 (¶2). The trial court found that service was insufficient because Mary signed for the mail rather than the defendant. *Id.* at (¶3). However, the Supreme Court reversed, holding that the defendant failed to rebut the presumption of proper service because he presented no evidence that Mary was not his agent. *Id.* at 305 (¶9). The Court stated that "[h]ad he done so, the burden then would have shifted to [the plaintiff] to prove 'Mary' was an authorized agent of [the defendant]." *Id.* *Long* is distinguishable from the present case. The proof of service in *Long* was simply evidence that the process server sent the summons and complaint to the defendant at an out-of-state address via certified mail. The proof of service was not evidence of Mary's identity or authority to accept service. Therefore, if the defendant had offered proof that Mary was

27

Indeed, it established a *presumption* of service that *James* was required to rebut. *Collins*, 184 So. 3d at 929 (¶18). In *McCain*, the Supreme Court rejected a similar argument that a trial judge had abused his discretion by crediting a non-testifying process server's affidavit over the in-court testimony of the party denying service. *McCain*, 791 So. 2d at 842 (¶¶6-8). The Court emphasized that if the party denying service wanted to challenge the process server's affidavit, he "had every right and opportunity to subpoena" and cross-examine the process server, but he "failed to do so." *Id.* at (¶8). The Court held that the trial judge did not abuse his discretion by disbelieving the party's in-court testimony and crediting the process server's affidavit. *Id.* Likewise, in this case, the chancellor did not abuse his discretion by crediting Deputy Rodela's signed return over the testimony of James and his relatives.

¶58. The majority opinion nonetheless "find[s]" that James's evidence "was sufficient to rebut the presumption of proper service." *Ante* at ¶36. Absolutely, "testimony by the contesting party, *if believed*, is sufficient to overcome the presumption." *Long*, 228 So. 3d at 305 (¶9) (emphasis added) (brackets omitted). But the trial judge is not *required* to believe the witnesses disputing service or accept their claims at face value. "[T]he trial judge may find that the testimony disputing proper service of process lacks credibility—and, thus, find that the presumption of proper service of process has not been rebutted." *Villavaso*, 309 So. 3d at 594 (¶21); *accord McCain*, 791 So. 2d at 842 (¶8). The important point is that the chancellor—not this Court—"is *the sole judge of the credibility of witnesses*." *Murphy*, 631

---

not his agent, the plaintiff would have needed to offer proof in response. Here, in contrast, the signed sheriff's return *is itself evidence* that, as stated therein, Deputy Rodela "personally delivered copies of the summons and complaint on the 29th day of October, 2022, to: James Wells."

So. 2d at 815 (emphasis added). By reversing the chancellor's determination, the majority improperly assumes that role for itself.

¶59. The majority opinion also argues that we need not defer to the chancellor's finding that the presumption was not rebutted because the chancellor did not make on-the-record credibility determinations. *Ante* at ¶¶37-39. However, the Supreme Court has held that we should not reverse a chancellor's findings "based on the absence of an express finding by the chancellor regarding [a witness's] credibility." *Rankin v. Rankin*, 323 So. 3d 1073, 1078 (¶12) (Miss. 2021). In *Rankin*, the Supreme Court reversed this Court, stating:

> The Court of Appeals' decision is based on the absence of an express finding by the chancellor regarding Kemily's credibility. It is true that the chancellor did not make a specific finding regarding Kemily's credibility. *In other words, the chancellor did not specifically state that she failed to find Kemily's testimony credible.* But a corollary principle is that with respect to issues of fact where the chancellor made no specific finding, we are required to assume that the chancellor resolved all such fact issues in favor of the appellee.
>
> . . . .
>
> Here, . . . the chancellor gave no indication that she disbelieved Kemily or that she failed to find her credible. *But even in the absence of a specific, express finding on Kemily's credibility, we are required to assume that the chancellor resolved this fact issue in favor of* [*the appellee*].

*Id.* at (¶¶12, 14) (emphasis added) (citations, quotation marks, and brackets omitted). Here, by finding that James failed to rebut the presumption, the chancellor necessarily found that James and his witnesses were not credible. "[E]ven in the absence of a specific, express finding on [the witnesses'] credibility, we are required to assume that the chancellor resolved this fact issue in favor of [Kathryn]." *Id.* at (¶14). The chancellor did not clearly err or abuse his discretion by finding that James had not rebutted the presumption of proper service.

29

Accordingly, the chancellor's decision must be affirmed, and I respectfully dissent.

**BARNES, C.J., LAWRENCE AND SMITH, JJ., JOIN THIS OPINION.**